George A. SIMMS, Appellant (Defendant below),

v.

STATE of Wyoming, Appellee (Plaintiff below).

No. 3917.

Supreme Court of Wyoming.

Jan. 5, 1972.

Rehearing Denied Feb. 3, 1972.

Fagan & Fagan, and Thomas J. Fagan, Casper, for appellant.

Clarence A. Brimmer, Atty. Gen., Frederic C. Reed and Richard A. Stacy, Asst. Attys. Gen., Cheyenne, for appellee.

Before McINTYRE, C. J., and PARKER and McEWAN, JJ.

Mr. Justice PARKER delivered the opinion of the court.

Defendant, George A. Simms, charged under § 6–54, W.S.1957, with the February 11, 1969, premeditated murder of Capp James Bird, was tried by jury, found guilty of second degree murder, and has appealed. He charges some eleven errors were committed by the trial court's:

1. Failing to discharge the jury panel challenged by the defendant and to empanel one that contained "a fair portion of Negro jurors based upon the proportion of the Negro population in the County";

2. Ruling that if defendant invoked his right to not have his wife, Norma Jean Simms, testify against him the State would be allowed to introduce a transcript of her testimony taken at the preliminary hearing—when she was not his wife;

3. Improperly instructing the jury;

4. Refusing certain instructions offered by defendant;

5. Permitting misconduct of State's counsel;

6. Admitting a dummy with arrows purporting to show the path of bullets through deceased's body;

7. Admitting into evidence broken eyeglasses not previously delivered to defendant for inspection;

8. Allowing the prosecution during direct examination to use a statement given by Norma Jean Simms and the transcript of her preliminary hearing testimony;

9. Refusing to allow testimony in reference to marijuana found in the bedroom deceased was occupying prior to his death;

10. Not allowing defendant's medical witness to testify as to the direction the deceased was moving when struck by the bullets and the sequence in which the bullets were fired;

11. Not admitting into evidence a statement of defendant taken by the police department on the night of the homicide.

In addition to these specific criticisms, it is argued generally that the verdict was not sustained by sufficient evidence and was contrary to law. Defendant admitted that he killed decedent but testified at the trial, and his counsel now accordingly contends, that he was acting in self-defense.

Although the trial was extended and the evidence voluminous, the relevant facts are uncomplicated and largely undisputed:

About 5:30 p. m. on February 11, 1969, in response to a telephone call, a police officer went to 1016 North Elma Street, Casper, and observed defendant, a black man, in the driveway, holding a .38 caliber Smith and Wesson revolver in the air. The officer asked for and received the gun, removing five empty cases from it. Investigating officers went inside and found deceased, a white man (clad in pajama tops, bath robe,[1] and slippers), lying on the bedroom floor, with ten bullet holes in his body. A loaded revolver belonging to Mrs. Simms was lying beside him. No fingerprints were on it. Testimony introduced at the trial showed that this gun had not been fired recently but that the one surrendered by defendant was the weapon which killed the deceased. The doctor conducting the autopsy testified there had been five bullets fired, one having made three holes in the body of deceased, one having made one, and the other three each having made two. Only one of the shots was fatal, severing the aorta, which would have dropped blood pressure to zero almost instantly. On the evening of the homicide defendant made a statement to the officers. At the time of the charged offense, the residence at 1016 North Elma Street was in the name of Norma Jean Simms, a black woman, to whom defendant had been married from 1960 to 1966 when they had been divorced. (They were remarried between

---

1. Later when the body was to be put on a stretcher, the coroner felt a bulge in the robe pocket and a roll of bills ($2,514) was removed.

the time of the preliminary hearing and the trial.) During their marriage the two had owned the residence jointly, and at the time of the offense charged owned certain business property in the city. Despite the divorce, they had continued to live together as husband and wife until January 1969. On February 10, 1969, defendant tried to telephone Mrs. Simms from Tacoma, Washington, but was unable to contact her. He called again from Spokane, leaving a message for her to the effect that he would try to be in Casper the next day about 5 p. m. After his arrival in Casper on the 11th at about 4 p. m. he spoke with Mrs. Simms over the phone—apparently regarding the sale of their Casper business property because of his financial situation —and was assured by Mrs. Simms that despite the fact Capp James Bird was there defendant might come to her home. He thereafter went to her residence, took out a .38 caliber Smith and Wesson revolver from his car (he indicated at the trial that this was done because he was fearful of deceased), knocked, was admitted, and went inside. There followed an altercation, the nature of which is somewhat disputed, and defendant fired several shots, which resulted in the death of decedent. No one except defendant and deceased saw what occurred immediately preceding the fatal shot as Mrs. Simms had run from the house before she heard shots fired.

## Challenge to the Array

Shortly before the trial, defendant filed a challenge to the array, charging that: the list of jurors selected was taken primarily from that part of the county tax assessment rolls containing only the names of persons owning real property with virtually none selected from that part of the county rolls containing the names of persons owning personal property; the ownership of real property in the county by negroes was negligible; a major portion of the few negroes appearing on the rolls as real property owners was not included in the list from which juries were empaneled; this resulted in the entire negro population of the coun-

ty being arbitrarily excluded from jury service although that race comprised approximately 5 percent of the county's total population; and defendant had a right to be tried before a jury of his peers. As support for this motion he presented affidavits of (1) one Devereaux, a black electrical engineer and housing chairman for the Wyoming-Colorado Conference of the NAACP, as to affiant's estimate of the population of the county, and (2) defendant's counsel to the effect that the ownership of real property by negroes was negligible, that typical of the failure to include negro owners of real property who appear on the assessment rolls but do not appear on the list of trial jurors were four persons, whom he named; that he had made personal investigation and inquired into procedure of compiling the list from which jurors were chosen to serve in the county, which study disclosed that the lists from which the jury panels were chosen came primarily from lists containing the names of persons owning real property with virtually none containing those who owned personal property only, that for a period of approximately thirteen years there had been a total of approximately three negroes selected to serve on jury panels in the county, that there were none on the existing panel, that none of the official district court personnel who would be involved in the trial of the defendant were negroes, and that the list of trial jurors from which the existing and previous jury panels were chosen did not include any persons within the county who did not show on the tax assessment rolls as the owners of property, real or personal, resulting in the entire class of nonproperty owners being excluded from jury service within the county.

The State countered this with affidavits from the assessor and clerk, the former stating that in accordance with his duties he obtains information as to qualifications for jury service from individual county assessment schedules and makes and certifies lists of trial jurors from the information obtained to the county clerk, who in turn

deposed that she receives these lists and deposits each name thereon in the official jury box. Concerning the procedure of drawing juror names, the bailiff testified the names are placed in a bin or container that is rotated to mix them and the clerk draws them by lot until the desired number of jurors is obtained. Questioned about the number of negroes on the juries during the past the bailiff said that in the thirteen years he had served he remembered three or possibly four negroes who had been on the jury.

▌ Numerous cases are cited by counsel as supporting the view that the challenge to the array should have been allowed. We find no occasion to reverse the trial court, which stated informally, "I am not satisfied that the assessor and officers haven't followed in good faith the statutory requirements." We discussed the question of challenges to the array in the case of Lofton v. State, Wyo., 489 P.2d 1169, 1171–1172, where incidentally Lofton used certain of the affidavits and supporting information on which defendant here relies for reversal on this point. As we there explained, study of the cited cases upon analysis shows that wherever the challenge has been recognized it has stemmed from evidence of *systematic* and *intentional* exclusion of some group and not merely from the fact that there are numbers of a group in the community and a lack of their members on the jury array. More importantly, we noted in Lofton, 489 P.2d at 1172, as we do here, the unfortunate method by which the attack on the jury array was launched, i. e., without any specific information as to numbers or persons eligible for jury service and solely on approximations, opinions, and recollections. Conjecture can have no part in such challenges and specific evidence, here lacking, is essential to establish a prima facie case of exclusion.[2]

## Mrs. Simms' Testimony

When the State announced that it would call Norma Jean Simms as a witness, a colloquy occurred in chambers in which it was explained to the court that she had testified at the preliminary hearing at a time when she was not married to the defendant but that she was at the time of the trial his wife. Defense counsel asked the court what its position would be if she refused to testify [meaning apparently if defendant objected to her testimony] and the court responded, "She can't be called without his consent * * *." Defense counsel continued, " * * * what I want to know is if she refuses to testify will the transcript of her testimony then be admitted into evidence?" The court responded, " * * * it would be my ruling if the defendant invokes his right, that the State might offer the transcript." After some further colloquy defense counsel stated, "Let the record show that being forced to elect between having the transcript of the defendant's wife at the preliminary hearing introduced against us or * * * have the defendant waive his right to not have his wife testify against him and in view of the Court's ruling the defendant will waive his right to not have his wife testify against him." Following this conference (taken outside the hearing of the jury), the witness testified on behalf of the State, and the court at the request of the prosecutor and over the objection of defendant permitted interrogation of her as a hostile witness and reference during the questioning to the transcript of testimony from the preliminary hearing (where she had appeared voluntarily and been represented by counsel, who had cross-examined) and to the statement she had given the night of the homicide.

▌ It would appear that when Mrs. Simms was first called there were two questions in the minds of court and coun-

2. While various methods are available for such a challenge, perhaps the simplest is the presenting of a person (or persons) who has paid taxes and is not included in the assessment roll or in the list submitted by the county assessor to the clerk of the district court although possessing all legal qualifications of a juror.

sel: (1) Could the wife testify against the husband at the trial? (2) Could the transcript of her testimony at the preliminary hearing taken at a time when they were not married be introduced against him? Defense counsel's concluding statement in the conference with the court, notwithstanding his speaking earlier of "being forced to elect," clearly and positively waived defendant's right to not have his wife testify against him. However, he now charges that the court erred in forcing him "to elect between waiving the defendant's right to not have his wife testify against him or have the transcript of her previous testimony" introduced and that the court compounded its error in allowing the State after calling Mrs. Simms as their own witness to treat her as a hostile witness and to use her statement and the transcript of her testimony in an attempt to discredit and impeach her testimony. Having chosen to have his wife testify as a witness, defendant is in no position to argue about his "forced" election, however, Professor Wigmore says that a disqualification of a witness by exercise of a privilege [3] makes the witness's present testimony unavailable and accordingly should allow resort to his former testimony, a doctrine which was not accepted by early English common law courts but was well established in chancery practice and would probably be generally followed in our courts. 5 Wigmore, Evidence, § 1409, pp. 163 and 164 (3 ed.). Among numerous cases cited in substantiation of this statement are McCoy v. State, 221 Ala. 466, 129 So. 21; Wyatt v. State, 35 Ala.App. 147, 46 So.2d 837 (certiorari denied 254 Ala. 74, 46 So.2d 847); both of which cases deal with the admission of a wife's testimony taken at a former hearing when the privilege of not testifying was invoked at the trial. Other cases pertaining to this situation are State v. Stewart, 85 Kan. 104, 116 P. 489; State v. Woods, 130 Kan. 492, 287 P. 248;

and the subject is treated in Annotation, 45 A.L.R.2d 1354. Such holdings are in line with the general rule which allows introduction of testimony given by a witness in a prior proceeding through use of properly authenticated notes of a court stenographer when the witness is unavailable because of privilege. Johnson v. People, 152 Colo. 586, 384 P.2d 454, 457; Mason v. United States, 10 Cir., 408 F.2d 903, 905. The single case relied upon by defendant for a contrary view, Cole v. State, 92 Tex.Cr.R. 368, 243 S.W. 1100, is not in point since it is noted that there the matter before the court was whether or not it was error for the district attorney to have *testified* that statements of a woman, not present at the scene of the homicide, and at the time of the trial the wife of defendant, had previously been "used against" the defendant.

Under this state of the law, the trial court was justified in its ruling, and furthermore, neither cogent argument nor authority is presented to show there was error in permitting the prosecutor's use of Mrs. Simms' statement and the transcript of her testimony at the preliminary hearing in interrogating her.

### *Instructions-Given*

■ Objection was interposed to six instructions, Nos. 10, 13, 17, 18, 19, and 23. Number 10 was the usual instruction given in a criminal case when there is no witness to the crime charged, to the effect that a person may be presumed to intend the consequences of his intentional acts. Defendant asserts that he was prejudiced since here an eyewitness testified as to attending circumstances immediately preceding the homicide. State v. Parmely, 65 Wyo. 215, 199 P.2d 112, 118, cited by him as authority, is not in point since in that opinion the court observed, "In the case at bar there were eyewitnesses present who testified as to what occurred *at the time* Messmer was injured." (Emphasis supplied.)

3. This court has heretofore construed § 1–142, W.S.1957 (1971 Cum.Supp.), as granting a privilege. Chamberlain v. State, Wyo., 348 P.2d 280.

Instruction 13 [4] relating to reasonable doubt is challenged because of the holdings in certain unnamed cases in another jurisdiction. Since this court has in numerous and recent cases approved the instruction, we find no occasion to examine the matter except on detailed and explicit presentation of authority, which is not present here.

Instruction 17 is questioned because the court after indicating that the testimony of accused cannot be arbitrarily rejected continued:

> "In weighing the testimony of the defendant in this case, you have the right to take into consideration his manner of testifying, the reasonableness or unreasonableness of his account of the transaction, and his interest in the result of the verdict, as affecting his credibility. You are not required to receive blindly the testimony of the accused as true, but you are to consider whether it is true, and made in good faith, or only for the purpose of avoiding conviction."

Defendant insists this language qualified the first part of the instruction, unfairly commented upon his position as a witness, and overemphasized the various matters which the jury may take into consideration in discrediting the witness.

This instruction is quite similar to that given in Haines v. Territory, 3 Wyo. 167, 13 P. 8, 15, and resembles one approved in Younger v. State, 12 Wyo. 24, 73 P. 551, 554, where the court said:

> " * * * We think the only substantial effect of the instruction is to inform the jury that they have the right in determining the credibility to be accorded to the testimony of the defendant to consider his interest in the result of the trial, in addition to noticing his manner, and taking into consideration the probability of his statements in connection with the other evidence in the cause. We do not think that the instruction is subject to the criticism that it unreasonably and improperly disparages the defendant's testimony." [5]

Instructions 18 and 19, taken together, are criticized as improperly defining the law by suggesting to the jury that the defendant had the burden of proving he acted in self-defense. We have examined these instructions carefully and find nothing therein which said or even suggested that defendant had the burden of proving self-defense. Instead we note that defendant has singled out for emphasis certain portions of the instructions to support his contention, and that may not be done.

Defendant says of Instruction 23 [6] that it unfairly commented upon the evidence and erroneously defined the purposes for which the character and disposition of the deceased might be considered. We perceive nothing in it which bears out the criticism, unsupported as it is by cogent argument or authority.

In summary, we have carefully examined the challenged instructions in light of the relevant law and as applied to the facts in the present appeal and hold that the court did not err in giving them.

---

4. YOU ARE INSTRUCTED that to establish the guilt of a defendant beyond a reasonable doubt is not meant that such guilt shall be established to an absolute certainty. Absolute certainty in the establishment of any fact is rarely attainable, and never required in courts of justice.

5. To the same effect is Reagan v. United States, 157 U.S. 301, 309, 15 S.Ct. 610, 39 L.Ed. 709.

6. "The court instructs the jury that evidence has been introduced of the character and disposition of the deceased. This was not admitted as tending in any way to justify his slaying by the defendant. This evidence is to be considered by the jury only as a circumstance, illustrating the facts of the homicide and the surrounding circumstances, and to be considered by you in determining who might have been the aggressor and the nature of aggression; it being more probable that a person of quarrelsome and dangerous character would make an unprovoked assault rather than a quiet and peaceable person."

## Instructions Not Given

■ Defendant objected to the court's refusing to give eight of his requested instructions, B through I, inclusive. We have reviewed the record and note that as to five of these the substance had been given by the court in other instructions and that the remaining three presented incorrect or inapplicable statements of the law. Accordingly, we observe no impropriety in the court's rejection.

## Misconduct of Counsel

■ Defendant contends that the prosecution in its opening statement improperly outlined a robbery motive to his prejudice. Without repeating or elaborating on the factual situation to which we have referred, we have no hesitancy in saying that the evidence adduced disclosed various circumstances from which it could have reasonably been argued that such was a motive. Thus there was no error. Templar v. Tongate, 71 Wyo. 148, 255 P.2d 223, 226; Nicholson v. State, 18 Wyo. 298, 106 P. 929, 931.

■ Defendant insists that prejudicial error was committed when in closing argument it was said that the State had no right of appeal. At that time objection was made to the statement and the court instructed the jury to disregard the comment. While the objection of defendant was well taken and such remark was not proper, there was no error when the court took immediate steps to remedy the situation. State v. Sorenson, 34 Wyo. 90, 241 P. 705, 707; State v. Benjamin, Mo., 309 S.W.2d 602, 605; State v. Merryman, 79 Ariz. 73, 283 P.2d 239, 241.

## The Dummy

■ It is submitted that the State's introduction of a dummy with arrows inserted in it "apparently to show the path of the bullets through the deceased's body and, indirectly, at least, to show the direction from which they came" was prejudicial error, citing as authority for such position Paseo v. State, 19 Wyo. 344, 117 P. 862.

This allegation is without merit. In the first place, the Paseo opinion was not dealing with an expert witness, who had performed an autopsy. More importantly, defendant here not only failed to object when the dummy was first presented but his counsel at that time stated, "We have no objection to it [the dummy] just so the Jury understands that is the only purpose [for demonstrative purposes], that is not purported to be the deceased." Subsequently the exhibit was received "solely for the purpose of the offer, namely, to demonstrate the direction and course of bullets."

## Broken Eyeglasses

■ During pretrial procedures defendant filed a motion for discovery and inspection, asking, among other things, that he be allowed to inspect "any physical evidence in connection with this case within the possession, custody, or control of the State." The court by order granted the motion with respect to Simms' written statement, the autopsy report, results of scientific experiments concerning ballistics and fingerprints, two guns and marijuana or drugs found at the scene, photographs made by the State at the scene, and results of tests concerning projectiles fired at or into the deceased, but denied the balance of the motion. At the trial, the State offered a plastic container holding eyeglasses, portions of which were broken, purporting to be found at the scene of the homicide, whereupon defendant moved for a mistrial, which was denied. He now maintains that under Rule 18(b), W.R.Cr.P., he had a right to discover what physical evidence the State in fact had and that the ruling was prejudicial error. The discussion of Rule 16(b), Fed.Rules Cr.Proc. (practically identical to our Rule 18(b)), by the court in United States v. Fioravanti, 3 Cir., 412 F.2d 407, 410–411, is in point, where, after recognizing that pretrial discovery in criminal cases is admittedly a complex and controversial question, it stated that application for relief under discovery rules is a matter within the sound discretion of the

district court and its ruling would not be disturbed except for an abuse of discretion. Defendant here did not avail himself of the relief afforded under Rule 18(h), W.R.Cr.P., of asking for inspection of materials not previously disclosed and for the granting of a continuance but rather undertook to by-pass the afforded redress and demanded a mistrial. This is impermissible. Further, there is no proper showing that the introduction of the glasses was prejudicial. Accordingly, we hold there was no error in this aspect.

### Rejection of Evidence

At the trial, defendant sought to prove by Dr. John A. Manns, M. D. and professional criminalist, the order in which the bullets entered the body and a deduction of the direction the deceased was going at the time he fell. The court rejected these offers as it also did that of a quantity of marijuana found in the bedroom of Mrs. Simms' Elma Street residence. These rejections are argued to have been erroneous and prejudicial. However, no cogent argument or authorities are presented in substantiation, and we see no merit in the contentions.

### Defendant's Statement

Defendant complains that during his direct examination the court refused to allow admission of or reference to a written but unsigned statement given by him to the Casper Police Department on the night of the homicide, saying that this constituted error because the writing was relevant and should be as available for his use "as it was, obviously, used by the State." However, he does not delineate the State's "use" nor present any legal authority to substantiate the claim of error. Moreover, no effort is made to show that the contention is not in direct contravention of the well recognized rule that self-serving declarations of a defendant in a criminal prosecution are never received in evidence unless they form a part of the res gestae and are the spontaneous expressions of the party making them under the spur of the moment in explanation of his motives. Reavis v. State, 6 Wyo. 240, 44 P. 62, 63.

### Sufficiency of the Evidence

It is argued at length that the verdict of murder in the second degree was not sustained by sufficient evidence. Defendant admits that he armed himself with a .38 caliber revolver before going on the premises where he knew Mr. Bird and Mrs. Simms were, and that he shot and killed the decedent. However, he points out that he went to the house on the invitation of Mrs. Simms, that he had a right to go there armed, and was not thereby deprived of the right of self-defense, that he shot the deceased in self-defense, his testimony to that effect not being impeached, and that his version was not improbable or inconsistent with the other facts and circumstances shown and should not have been arbitrarily rejected as it obviously was by the jury. In so contending, however, he should not overlook other matters which the jury was entitled to consider and resolve, and since there were certain conflicts in the evidence the jurors were in those areas the sole judges of the credibility of the witnesses. Among these factors was the circumstance that although defendant said he armed himself before he entered the house "Because I knew Junior Bird was in there, he packed pistols, and he indicated he would do something to me if I stood in the way of money," another witness who had seen the deceased frequently had never known of his carrying a gun. A further inconsistency became apparent when no gun of the dead man was found by the officers at the scene of the homicide or at his apartment. The only three guns found were the fatal weapon owned by defendant, the one near the dead body and belonging to Mrs. Simms, but on which there were no fingerprints, and one underneath the floor mat of defendant's car. Other circumstances although not conflicting were entitled to consideration: the dishabille of deceased—dressed only in pajama top, robe, and slippers; the testimony of the pathologist who performed the

post-mortem as to the direction of the bullets, stating that only one shot, which severed the aorta, was fatal and that another bullet had struck deceased in both wrists, which would have prevented him from holding a gun. Other facts and aspects disclosed by the evidence and within the province of the jury to weigh might, of course, be enumerated, but these mentioned are sufficient to disclose substantial evidence for sustaining the verdict.

Affirmed.

McEWAN, Justice (concurring).

I approve of all of the majority opinion with the exception of that portion under the heading "Mrs. Simms' Testimony," and with that portion I concur. The defendant did not make any contention nor did he point out where any of the testimony given by the wife was detrimental or prejudicial to him. I have examined the record and find nothing in the wife's testimony that appears to be detrimental to him. Her testimony is consistent with the defendant's theory of the case; that is, self defense.